**Helena Mary Faro
GERLACH, Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. A–501.**

Court of Appeals of Alaska.

May 10, 1985.

---

Linda Wilson, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

David Mannheimer, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Helena Mary Faro Gerlach was convicted of custodial interference in the first degree,

---

claim, since DeHavilland had no duty to Prov-          idence Washington.

a class C felony. AS 11.41.320.[1] Gerlach appeals, arguing that the trial court erred in refusing to permit her to present a defense of necessity to the jury.[2] We affirm.

Robert Faro was originally married to Helena Gerlach's half-sister, Gail. They were divorced and he was awarded custody of their four children. *See Faro v. Faro*, 579 P.2d 1377 (Alaska 1978). Thereafter, Faro married Gerlach, and they had one child, Angela. In the fall of 1981, Gerlach and Faro separated and commenced divorce proceedings. Angela's custody was contested. Faro and Gerlach entered into an agreement under which Robert Faro had temporary custody of Angela and Gerlach had limited visitation rights. The parties were interviewed by the superior court's custody investigator and by a court-appointed psychologist, Dr. James Parsons. Dr. Parsons concluded that both parties were fit custodians for Angela but that permanent custody should be placed with Gerlach. After evaluating the psychologist's report, the parties and counsel met with the custody investigator and entered into a written stipulation that Faro would continue to have temporary custody of Angela pending the final decree of divorce, but that Gerlach's visitation rights would be expanded. Thereafter, Gerlach became concerned that Faro would take Angela outside the state and obtained a court restraining order preventing him from doing so.

On February 2, 1982, three weeks after the modified custody agreement was signed by Gerlach and Faro, Gerlach picked up Angela from her babysitter and flew with her to the State of Washington. Gerlach hid Angela from Faro for over a year. She was finally located and arrested by Washington authorities.

Before trial, Gerlach made the following offer of proof in support of her defense of necessity:

(1) Gerlach would testify that she believed that Faro was not properly caring for Angela, based on Gerlach's discovery that Angela was suffering from a vaginal infection and appeared dirty and unkempt. She would also testify that she knew that Faro's children by his former marriage were slapped, beaten, and verbally abused after visits to their mother. Gerlach would also testify that she had little faith in judicial proceedings as a means for resolving custody disputes. She knew that Faro had more money than she had, and feared that she would run out of funds before the custody dispute was resolved. Gerlach was particularly concerned that Judge

---

1. Alaska Statute 11.41.320 provides:
   *Custodial interference in the first degree.* (a) A person commits the crime of custodial interference in the first degree if the person violates AS 11.41.330 and causes the victim to be removed from the state.
   (b) Custodial interference in the first degree is a class C felony.
   Alaska Statute 11.41.330 provides:
   *Custodial interference in the second degree.* (a) A person commits the crime of custodial interference in the second degree if, being a relative of a child under 18 years of age or a relative of an incompetent person and knowing that the person has no legal right to do so, the person takes, entices, or keeps that child or incompetent person from a lawful custodian with intent to hold the child or incompetent person for a protracted period.
   (b) Custodial interference in the second degree is a class A misdemeanor.

2. In February of 1982 when Gerlach abducted her daughter Angela Faro, former AS 11.81.320 provided:

*Justification: Necessity.* Conduct which would otherwise be an offense is justified by reason of necessity to the extent permitted by common law when
   (1) neither this title nor any other statute defining the offense provides exemptions or defenses dealing with the justification of necessity in the specific situation involved; and
   (2) a legislative intent to exclude the justification of necessity does not otherwise plainly appear.
Alaska Statute 11.81.900(b)(15) provides that if some evidence of a defense is present, the state must disprove the existence of the defense beyond a reasonable doubt.
Alaska Statute 11.81.320 was subsequently amended to make "necessity" an affirmative defense which the defendant must prove by a preponderance of the evidence. AS 11.81.320. *See* AS 11.81.900(b)(1) (defining "affirmative defense").

Carlson had authorized the temporary custody agreement as he had been the judge who ruled in Faro's favor in the earlier *Faro v. Faro* litigation.

(2) Bobby Faro, Gerlach's nephew and Faro's son by his earlier marriage (a fifteen-year-old boy suffering from muscular dystrophy, confined to a wheelchair), would testify that Faro had disciplined his children by beating them with a belt and slapping them, often for things that were not really their fault. Bobby would also testify that Faro slapped Angela when she came home from a visit with Gerlach.

(3) Gerlach's sister Gail would testify that after her own custody dispute with Faro, he abused their children when they returned home from visits with her.

(4) Finally, Dr. Parsons would testify that he saw both Faro and Gerlach at the time of the divorce and recommended that Angela remain with Gerlach.

The purpose of this testimony would have been to show Gerlach's state of mind and her fear of imminent harm to Angela. Superior Court Judge Seaborn J. Buckalew, Jr., held that Gerlach's offer of proof was insufficient as a matter of law. He therefore entered a protective order precluding her from raising the issue of necessity at trial.

## DISCUSSION

Gerlach was convicted of custodial interference in the first degree. Her conviction required the state to prove, *inter alia*, that she intentionally, *see* AS 11.81.900(a)(1), kept the child from its lawful custodian for a "protracted period,"[3] knowing that she had no legal right to do so.[4]

The decision in this case is controlled by existing law. *See Cleveland v. Anchorage*, 631 P.2d 1073 (Alaska 1981); *Wells v. State*, 687 P.2d 346 (Alaska App.1984); *Schnabel v. State*, 663 P.2d 960 (Alaska App.1983).

In *Cleveland* the supreme court said:

The defense of necessity requires a showing of three essential elements:

1) The act charged must have been done to prevent a significant evil; 2) there must have been no adequate alternative; 3) the harm caused must not have been disproportionate to the harm avoided.

It is available if the accused reasonably believed at the time of acting that the first and second elements were present, even if that belief was mistaken; but the accused's belief will not suffice for the third element. An objective determination must be made as to whether the defendant's value judgment was correct, given the facts as he reasonably per-

---

**3.** The parties have not briefed the meaning of this statute nor have they discussed the interplay between *mens rea* and a necessity defense. The term "protracted" is not defined in the statute. *See* AS 11.41.370 (defining some of the terms found in the statutes prohibiting custodial interference). Therefore the term should receive its customary meaning unless a judicial gloss is necessary to avoid vagueness problems. *See* AS 01.10.040 ("Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage. Technical words and phrases and those which have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, [*i.e.*, by judicial interpretation, *see Lynch v. McCann*, 478 P.2d 835, 837 and n. 8 (Alaska 1970) ] shall be construed according to the peculiar and appropriate meaning."). If the term "protracted period" is ultimately interpreted to mean "an unreasonably long period under all the circumstances," a jury may then be re-

quired to consider the defendant's reasons for withholding the child in determining whether the child was in fact withheld for a protracted period. Thus, it may be that the legislature's requirement that the withholding be for a protracted period was intended to preempt a necessity defense by in effect requiring the state to disprove necessity in proving the elements of its case. It is unnecessary for us to reach this issue in this case because Gerlach's retention of Angela in Washington for over a year would appear to satisfy the "protracted period" requirement, however it is defined.

**4.** The mental state "knowingly" is defined in AS 11.81.900(a)(2). Since the issue was not argued, we express no opinion whether custodial interference is one of the situations in which the legislature intended to require that a person know that her action violates the law before she can be convicted. *See* AS 11.81.620.

ceived them. *Nelson v. State*, 597 P.2d 977, 979, 980 n. 6 (Alaska 1979).

631 P.2d at 1078 (footnote omitted). The supreme court elaborated on the third requirement saying:

> [T]he defense of necessity requires a showing that the harm sought to be avoided was greater than the harm reasonably foreseeable as resulting from a defendant's illegal actions. [Citation omitted.] That is, the harm reasonably foreseeably resulting from a failure to act must be balanced against that foreseeably resulting from the illegal action.

*Id.* at 1080. In reaching this balance, the trial court must consider past judicial decisions and legislative enactments, for:

> [t]he defense of necessity is available only in situations wherein the legislature has to [sic: not] itself, in its criminal statute, made a determination of values. If it has done so, its decision governs.

*Id.* at 1081, *quoting* W. LaFave & A. Scott, *Criminal Law* § 50 at 382.

In *Wells,* we dealt with the defense of necessity to a charge of criminal escape. We concluded that escape was a "continuing offense" and that a person defending an escape charge on the grounds of necessity must establish "some evidence justifying his continued absence from custody as well as his initial departure." 687 P.2d at 349–50.

In *Schnabel,* the defendant was charged and convicted of operating wheeled equipment in a salmon stream without a permit. AS 16.05.870(b), AS 16.05.880. The trial court denied him a necessity defense and he appealed, arguing that his violation of the statutes was "necessary" in order to profitably operate his mining claims. We rejected Schnabel's claims, concluding:

> Before a person is entitled to an instruction on "necessity" there must be "some evidence" in the record that the action which the person took was necessary, *i.e.,* that he had no other alternative, to avoid an irreparable injury which, under the circumstances, outweighed any injury likely to result from the action taken.... Schnabel had an adequate

remedy at law. Consequently, he was not faced with irreparable injury. If Schnabel disagreed with the Commissioner's rejection of his application to cross the stream, the Administrative Procedure Act provides an informal speedy remedy for resolving that disagreement. *See* AS 44.62.330–.630.

> . . . .

> There is nothing in the instant record which would support a finding that recourse by Schnabel to either his administrative or judicial remedy would have been insufficient to resolve any "necessity" with which he was faced.

663 P.2d at 966.

■ Gerlach predicates her "necessity" defense on anticipated harm to her daughter Angela. Specifically, she was concerned that Mr. Faro had neglected Angela in permitting her to incur a vaginal infection and had psychologically abused Angela in interrogating her after visitation regarding Gerlach's activities. Gerlach also feared potential physical abuse based upon her experiences in Faro's home and the statements made by Gail and Gerlach's nephew Bobby. However, Gerlach's claims fail the respective tests established in *Cleveland, Schnabel,* and *Wells.*

Gerlach's claim fails to meet the third prong of the *Cleveland* test, that the harm caused must not be disproportionate to the harm avoided. There is no question that the harm to Faro from Gerlach's actions was reasonably foreseeable. Faro's contact with his daughter was totally eliminated. It is instructive that if Gerlach's fears of physical abuse had been shown to be well-founded and she had been awarded custody or the State Department of Health and Social Services had taken temporary custody of Angela for Angela's protection, Faro would at least have had an opportunity for controlled visitation with Angela. *See* AS 25.24.300 (custodian's obligation to permit visitation in conformance with court order), AS 47.10.084(c) (right of visitation with children in state custody). Gerlach's unilateral action denied him any contact with Angela at all. In addition, Gerlach's

claim fails under *Cleveland* because the legislature has made a determination of values in this situation. In establishing procedures for litigating claims of child abuse and neglect and in punishing custodial interference, the legislature addressed Gerlach's fears and rejected her suggested remedy of self-help.

More significantly, Gerlach, like Schnabel, had ready remedies at law. Even if legislative remedies were not intended to totally preclude self-help, Gerlach should have exhausted them. She was involved in an ongoing custody dispute and was represented by counsel. When she feared that her husband might remove Angela from the state, Gerlach successfully prosecuted a temporary restraining order precluding him from doing so. In addition, Gerlach and Faro had been interviewed by both the superior court's custody investigator and by an independent psychologist appointed by the court who had recommended that Gerlach be given permanent custody. If Gerlach thought Angela was in imminent danger, she should have sought temporary custody rather than stipulating to Faro's continued custody. Gerlach does not contend that her lawyer was incompetent or refused to follow Gerlach's directions.

Judge Buckalew properly found that Gerlach's offer of proof failed to sustain the requirements for the defense of necessity. The harm she caused by removing Angela from the state was clearly disproportionate to the harm she avoided. Further, like Schnabel, Gerlach had adequate remedies at law. Her failure to avail herself of those remedies precludes her reliance on a necessity defense. Thus Gerlach's claims failed the test established in *Cleveland* and *Schnabel.*

Finally, it is clear that the legislature views custodial interference to be a continuing offense. The legislature was concerned not only with the initial interference with custody, but also with the duration of the interference. In fact, the offense is committed only where restraint is for a "protracted period." *See* AS 11.41.-330. Also, the legislature differentiates between a misdemeanor and a felony based upon whether the interference involves removal of the child from the state. AS 11.41.320, AS 11.41.330. Since custodial interference is a continuing offense, it necessarily follows that one relying on a defense of necessity must offer some evidence justifying the duration of the interference as well as the initial act of interfering. *Wells v. State,* 687 P.2d at 350. Gerlach's fears might have justified her in temporarily refusing to return Angela to the babysitter chosen by Faro, while Gerlach sought legal or medical advice regarding her fears that Angela was being mistreated or contacted the Department of Health and Social Services to make a child abuse or neglect report.[5] *See, e.g.,* AS 47.17.010–040, AS 47.10.020, AS 47.10.142. *See also State v. R.H.,* 683 P.2d 269 (Alaska App.1984).[6] *Cf. Eilers v. Coy,* 582 F.Supp. 1093 (D.Minn.1984). Gerlach's fears could not justify her removing the child from the state in violation of an interim custody order and secreting the child for over a year.

The legislature has recognized the risk of child abuse and neglect and has established remedies to protect vulnerable children. AS 47.10.020, AS 47.10.142. The legislature has also recognized the emotions involved in child custody disputes and has sought to establish procedures for resolving custody disputes to ensure that the

---

**5.** We do not suggest that a child abuse report would necessarily have been warranted in this case. Gerlach's concerns about child abuse and neglect appear to have been longstanding. It appears Gerlach discussed these claims with her attorney and Dr. Parsons and apparently neither felt that any danger to Angela was imminent. In fact despite Dr. Parsons concerns about Faro's discipline practices, the parties stipulated to continuing temporary custody with Faro.

**6.** It appears that the legislature made provision for temporary retention of a child in order to seek medical or legal advice or to make a child abuse or neglect report since it only penalizes custodial interference with the "intent to hold the child for ... a *protracted* period." AS 11.-41.330 (emphasis supplied).

child's interest will not be subordinated to vengeful wars between parents. AS 25.-24.140(a)(2) (court order for care, custody, and maintenance of children pending divorce), AS 25.24.150 (judgment for custody and visitation of children as part of the final decree). If Gerlach was financially unable to litigate with her husband she was entitled to obtain funds from him in order to litigate. AS 25.24.140(a)(1). If Angela's interests were not adequately protected by Gerlach and Faro, Angela was entitled to her own lawyer if necessary at state expense. *See* AS 25.24.310. To permit a litigant such as Gerlach to use a necessity defense as a means of relitigating a custody determination would not appreciably advance the legislative goals of preventing child abuse and neglect which are adequately protected by existing legislation and would not serve the legislative purposes exhibited in the enactment of the statutes providing a judicial forum to litigate child custody disputes and barring custodial interference. Where the legislature has established procedures for determining custody disputes and separate but complementary procedures for investigating and preventing child abuse and neglect, a person cannot be permitted to ignore those procedures and rely on self-help simply because he or she distrusts lawyers, judges, and social workers. We hold the trial court did not err in denying Gerlach the right to rely on a necessity defense in this case.

The judgment of the superior court is AFFIRMED.